**THIS ORDER IS SIGNED AND ENTERED.**

Dated: February 6, 2013

_____
**Hon. Robert D. Martin
United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

In re:

ANDREW J. WEIHERT,                                                          (Chapter 7)

        Debtor.                                                             Case No. 12-10893

PATRICIA A. JOHNSON and
DEL JOHNSON,
      and
PATRICIA A. JOHNSON, Special Administrator
of the Estate of ASHLEY A. JOHNSON, Deceased

        Plaintiffs,
v.                                                                                      Adv. No. 12-105

ANDREW J. WEIHERT,

        Defendant.

**MEMORANDUM DECISION**

This unusual case asks a bankruptcy court to determine whether an assault (possibly a sexual assault or rape) and a wrongful death (possibly a murder) were the willful and intentional acts of the debtor, and, whether claims arising from the injuries are dischargeable in the debtor's bankruptcy. Because no liability for the alleged acts has yet been determined and no damages

1

assessed, this opinion and the decision it explains is to some degree advisory. This court lacks the jurisdiction, or at least the power and authority, to quantify any obligation arising from the debtor's acts. Those claims are determinations of state law alone. However, a determination that those claims are dischargeable would render any further pursuit of the claims a violation of the injunction under 11 U.S.C. § 524.

The plaintiffs have alleged that the debtor, as a host of an underage drinking party, and as a participant with others in a sexual assault and battery, willfully and maliciously injured Ashley Johnson, one of the under-aged drinkers at the party. The alleged victim did not survive an automobile accident which happened within minutes after she left the drinking party. The defense acknowledges that the claims and the evidence might support a finding of negligence but deny that the injuries to Ashley Johnson were willful or malicious.

This matter was tried to the Court on December 6, 7 and 19, 2012; the plaintiffs were represented by Joseph F. Owens and Eliza M. Reyes and the defendant was represented by Vincent J. Guerrero and Jeffery D. Nordholm; the evidence has been closed; and the parties have made closing arguments; so, I make the following:

**FINDINGS OF FACT**

1.   Debtor Andrew J. Weihert filed a voluntary Chapter 7 petition on February 23, 2012.

2.   Plaintiffs Patricia A. Johnson and Del Johnson filed a complaint against the debtor on May 24, 2012. The plaintiffs are the parents of Ashley Johnson. Their claims arise out of the circumstances immediately preceding her death on the morning of July 17, 2010. Patricia

2

Johnson filed both in her individual capacity and as the special administrator of the estate of Ashley A. Johnson, deceased.

3. Shortly after 2:00 a.m. on July 17, 2010, Ashley Johnson died in a single car rollover accident off of West Road in Watertown, Wisconsin.

4. The relevant chain of events leading up to her death began in the afternoon of July 16, 2010.

5. Ashley Johnson's friend Michelle Mess learned around 3:00 p.m. on July 16 that the debtor was planning a party at his house that evening. It was arranged that Mess would drive Ashley Johnson to the party. The debtor had not previously met or known Ashley Johnson.

6. Mess had also agreed to drive Brett Hart and Jaime Malkowski to the party. She drove her red Dodge Neon to their residence around 6:00 p.m. to pick them up.

7. Mess took Hart and Malkowski back to her house to wait until Ashley was ready. Around this time, Ashley Johnson was at the beach near her house watching the sunset with Tyler Bostwick.

8. Ashley Johnson texted Mess when she was ready to be picked up.

9. With Hart and Malkowski in the car, Mess arrived at Ashley Johnson's house, and Ashley got into Mess's car.

10. The four of them drove back to Mess's house to wait for further information regarding when the party would start.

3

11. Around this time, Mess was exchanging texts with Kyle Porzky, the debtor's cousin. Mess requested that Porzky and the debtor procure beer for her, offering to reimburse them for it.

12. Mess received the green light to go to the party around 8:30 p.m.

13. Mess drove Hart, Malkowski, and Ashley Johnson to the debtor's house at N8890 West Road, Watertown, Wisconsin. They arrived around 9:00 p.m.

14. Mess, Hart, Malkowski, Ashley Johnson, the debtor, Porzky, and the final guest, Martin Hutchins, were the only seven persons who attended the party.

15. Samantha Johnson did not attend the party.

16. Shortly after her arrival, Mess paid the debtor for the beer he had purchased for her.

17. The seven partiers played beer pong and watched movies, including *Joe Dirt* and a home video of the debtor four-wheeling.

18. Both Mess and Ashley Johnson were underage, and both were drinking at the party. The debtor knew they were drinking, and he knew they were underage.

19. No persons are remembered by those present as having gone upstairs during the party. The debtor's bedroom is located on the ground floor of his house.

20. Malkowski wanted to leave the party early because she was sick. At around 10:45 p.m., Mess left the party to drive Hart and Malkowski home. They arrived at Hart and Malkowski's residence shortly after 11:00 p.m.

4

21. Ashley Johnson stayed behind at the party with Hutchins, Porzky, and the debtor.

22. At one point, Hutchins slapped Ashley Johnson's bottom. The debtor told Hutchins that behavior was unacceptable.

23. After dropping off Hart and Malkowski at their residence, Mess returned to the party.

24. The remaining partiers continued to play beer pong and watch movies.

25. Around 1:30 a.m., Hutchins and Porzky told Mess that she was too drunk to drive and offered to drive her home. Mess refused their offers and continued to stay at the party.

26. Around 2:00 a.m., the debtor ended the party because he needed to wake up early that morning to get to his work milking cows.

27. Ashley Johnson left the party site in Mess's red Neon, with Mess driving.

28. Mess was wearing her seat belt. Ashley Johnson was not wearing her seat belt.

29. The car approached a 90 degree turn on West Road at a speed too great for Mess to execute the turn. When the car hit the gravel on the inside part of the curve, it started rolling over.

30. Hutchins and Porzky were standing outside of the debtor's house when they heard tires squeal. They jumped into their vehicles and drove slightly more than one-quarter mile to the accident scene.

31. When Mess's car stopped rolling, it was on its side. The driver's side window was on the grass, and the open passenger side window was facing the sky.

32. Mess turned the vehicle's key to "off" because she was worried about a fire starting, and then she climbed out of the car.

33. Hutchins and Porzky arrived at the scene and inquired where Ashley Johnson was. Mess told them that Ashley was still in the car.

34. Hutchins jumped into the car and felt Ashley Johnson's body for a pulse.

35. When he did not feel a pulse, Hutchins lifted Ashley Johnson's body out of the car.

36. Hutchins and Porzky carried Ashley Johnson's body away from the car and laid it on the grass.

37. Mess instructed Hutchins and Porzky to leave the accident scene so they would not get in trouble. Hutchins and Porzky insisted that Mess first call 911. After she had called 911, they both left the scene.

38. Mess attempted to perform CPR on Ashley Johnson until the police arrived.

39. Ashley Johnson's body was transferred to Milwaukee in a "body bag" for examination. At the medical examination, Ashley Johnson's body exhibited injuries consistent with rollover accidents.

## **CONCLUSIONS OF LAW**

1. This Court lacks jurisdiction to enter judgment determining the specific amount of debt owed to the plaintiffs or the extent of any damages suffered by the plaintiffs.

2. The only issue before this Court is whether any debt which might be owed to the plaintiffs is non-dischargeable by the debtor in his bankruptcy.

3. The plaintiffs have failed to meet the burden of proving by a preponderance of the evidence that the debtor caused willful and malicious injury under 11 U.S.C. § 523(a)(6) on both their first and second causes of action.

4. No battery or sexual assault of Ashley Johnson by the debtor has been proved.

5. No conspiracy to commit any battery or sexual assault of Ashley Johnson has been proved.

6. Any social host liability that the debtor may have under Wisconsin law does not rise to the level of willful and malicious injury in this case.

## **DISCUSSION**

Section 157 of Title 28 specifically withholds jurisdiction for bankruptcy courts to liquidate personal injury and wrongful death claims. Under Section 157, bankruptcy courts have subject matter jurisdiction to hear "core proceedings." 28 U.S.C. § 157(b)(1). Core proceedings

> include, but are not limited to . . . allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 *but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11*.

7

28 U.S.C. § 157(b)(2)(B) (emphasis added). In this case, the alleged injuries constituted both personal injury and wrongful death claims. Since the debt is being held dischargeable, any determination of liability or damages would have to be for purposes of distribution in the bankruptcy case. Therefore, this Court does not have the jurisdiction to enter a judgment on liability or damages in this case.

Even if the debt had been held non-dischargeable, this Court still would not have been able to enter a money judgment. Determination of liability and damages would no longer have been for purposes of distribution in the bankruptcy case, but under the reasoning of *Stern v. Marshall*, this Court lacks the constitutional authority to enter a money judgment for non-dischargeable debt. *Stern v. Marshall*, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011). As bankruptcy scholar Douglas Baird explains in his article, *Blue Collar Constitutional Law*, the Supreme Court in *Stern* "distinguishes between administering the bankruptcy estate on the one hand and engaging in actions that are the province of a common law judge on the other." Douglas G. Baird, *Blue Collar Constitutional Law*, 86 Am. Bankr. L.J. 3, 4-5 (2012). Liquidating a non-dischargeable debt is not necessary to administer the bankruptcy estate, and dischargeability can be determined independent of liquidation.

This Court does have both the authority and the jurisdiction to determine dischargeability of any debt owed by the debtor to the plaintiffs. Bankruptcy courts have jurisdiction to make "determinations as to the dischargeability of particular debts," 28 U.S.C. § 157(b)(2)(I), and "[d]etermining the scope of the debtor's discharge is a fundamental part of the bankruptcy process." *In re Deitz*, 469 B.R. 11, 20 (B.A.P. 9th Cir. 2012). Under the logic of *Stern*, since determining dischargeability is necessary to administer the bankruptcy estate, the bankruptcy

8

court has the constitutional authority to enter final judgments on dischargeability. *See Stern*, 131 S. Ct. 2594.

The plaintiffs conceded in argument that there were only three items of evidence which supported their claims. Those were the testimony of Samantha Johnson, the identification and condition of denim shorts worn by Ashley Johnson on the night in question, and a brown leather belt which was found in the vehicle by crime scene investigators. The belt was identified by Patricia Johnson as having belonged to and been worn by Ashley Johnson on the night in question. The remainder of the plaintiffs' case depended on the impeachment of witnesses with stories inconsistent with Samantha Johnson's testimony or with a hypothesis for the events not directly subject to evidence in the case.

Samantha Johnson's testimony was, in most significant parts, incredible. She claimed to have been at the underage drinking party but her Grandmother with whom she lived testified that she never left the house on the evening of July 16th or the morning of July 17, 2010. No other witness corroborated the testimony of Samantha Johnson and none testified that she was present at the party. In addition, Samantha Johnson was said to have changed her testimony. Indeed, the story of the events of the evening of July 16th and the morning of July 17th varied in significant detail from one telling to the next, such as first claiming the victim was struck by a baseball bat and later claiming that she was struck by a softball-sized rock. There were many similar inconsistencies between prior and later stories attributed to Samantha Johnson. Her credibility was further undercut by evidence of influence, both by oral persuasion and by exchange of money and gifts from Plaintiff, Patricia Johnson, which appeared to have shaped Samantha Johnson's testimony. For these reasons, Samantha Johnson's account of the events of July 16th and 17th is not credited.

9

The denim shorts were on Ashley Johnson's body when it was examined by the medical examiner. They were extensively stained by blood, especially in the area of the crotch and left leg hole. The button fastener at the waistband was missing and appeared to have been torn out of the fabric completely, leaving a hole which appeared to oppose the button hole. Several teeth of the zipper appeared to be missing or damaged. The plaintiffs have argued for adopting an inference that the damage and staining to the shorts is the result of a sexual assault. However, the medical examiner, whose experience is very extensive, testified that the location of blood stains on clothes which have remained on a victim transported in a body bag is not a reliable indicator of the location or nature of injuries to a body. This is because blood flows and pools in low spots as the bag is moved. In addition, there is no direct evidence of when or how the button was torn or the zipper damaged.

The brown belt was even more remote to the plaintiffs' allegations than the other two items of evidence. Patricia Johnson said she saw it in the belt loops of Ashley's shorts just prior to Ashley's departure in Mess' car. No other witness placed the belt anywhere except the crime scene investigator who found it lying on the floor of Mess' car after the accident, as was shown by a crime scene photo. Plaintiffs have argued that a close examination of the photo indicates that the belt was not functional as a belt when found and there is some appearance of the buckle being loosened or detached. But, the suggested inference that the belt was torn in an assault on Ashley Johnson and removed from her shorts to facilitate a sexual assault has no independent proof. It is equally likely that the belt was removed from the shorts at some time while Ashley Johnson was in the car and under no duress because the buckle failed or that the buckle failed during that removal.

At the medical examination (autopsy), the examiner found no injury to Ashley Johnson's genitalia or anus and no injuries indicative of resistance to an assault. An examination undertaken by Patricia Johnson of the shorts and panties found no evidence of sperm or semen. No examination was apparently made for DNA. So, neither the incredible testimony of Samantha Johnson nor the physical evidence sustains the plaintiffs' allegations of sexual assault. Other allegations of assault, battery and murder depend wholly on the testimony of Samantha Johnson and have been traced to the anguished imagination of Ashley Johnson's grieving mother.

As part of their first claim, the plaintiffs also alleged that the debtor was part of a conspiracy to commit battery and assault. Under Wisconsin law, there is "no such thing as a civil action for conspiracy," but "[t]here is an action for damages caused by acts pursuant to a conspiracy." *Radue v. Dill*, 74 Wis. 2d 239, 241, 246 N.W.2d 507, 509 (1976) (quoting *Singer v. Singer*, 245 Wis. 191, 195, 14 N.W.2d 43, 46 (1944)). In this case, no conspiracy or damages pursuant to a conspiracy were proved. The only evidence of the alleged conspiracy was the same as that already discussed: the shorts, the belt, and the incredible testimony of Samantha Johnson. To the extent that the plaintiffs alleged assault and battery, they alleged that the debtor acted in concert with other parties and hence was part of a conspiracy. Since the assault and battery were not proved, the conspiracy was not proved either. No additional evidence of any plan or scheme was offered.

Turning to the plaintiffs' second claim of social host liability, this case presented the complicated question of whether a claim based in negligence can ever be considered non-dischargeable as a willful and malicious injury. In *Jendusa-Nicolai v. Larsen*, the Seventh Circuit Court of Appeals reviewed the definitions of willful and malicious injury and noted that "courts

11

are all over the lot in defining this phrase in section 523(a)(6)." *Jendusa-Nicolai v. Larsen*, 677 F.3d 320, 322 (7th Cir. 2012). But the Court of Appeals also stated that it felt the variation in definitions is a "pseudo-conflict among circuits" of "different legal definitions of the same statutory language that probably don't generate different outcomes." *Jendusa-Nicolai*, 677 F.3d at 322-23. In attempting to reconcile these variations, the Court of Appeals held that "whatever the semantic confusion, we imagine that all courts would agree that a willful and malicious injury, precluding discharge in bankruptcy of the debt created by the injury, is one that the injurer inflicted knowing he had no legal justification and either desiring to inflict the injury or knowing it was highly likely to result from his act." *Id.* at 324.

Generally, negligence and recklessness do not constitute willful and malicious injury. In *Kawaauhau v. Geiger*, the Supreme Court held that "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Kawaauhau v. Geiger*, 523 U.S. 57, 64 (1998). In *Kawaauhau*, the bankruptcy court had concluded that the doctor's treatment fell so far below the appropriate standard of care that it was willful and malicious, but the Supreme Court held that "nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Id.* at 61. Instead, willful and malicious injury naturally overlaps with intentional torts. As the Supreme Court explained in *Kawaahau*, "the (a)(6) formulation triggers in the lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless torts" because "[i]ntentional torts generally require that the actor intend the *consequences* of an act, not simply the act itself." *Kawaauhau*, 523 U.S. at 61-62 (internal quotations omitted). However, the overlap is not exact. Not all intentional torts involve an intent to cause injury. *Jendusa-Nicolai*, 677 F.3d at 322. For example, "libel can be committed by someone who believes, though negligently or even recklessly, that his libelous

12

statement is privileged because it's true; such a debt is therefore dischargeable." *Id.* (citing *Wheeler v. Laudani,* 783 F.2d 610, 615 (6th Cir. 1986)).

That leaves the question of whether there exists a small category of negligence cases that could constitute willful and malicious injury. Here, the plaintiffs' second claim was for social host liability, a claim based in negligence. *See* Wis. Stat. § 125.035(4)(b) ("Subsection (2) [providing immunity from civil liability for social hosts that provide alcohol] does not apply if the provider knew or should have known that the underage person was under the legal drinking age and if the alcohol beverages provided to the underage person were a substantial factor in causing injury to a 3rd party."). Assuming that the debtor were found to have social host liability—based on his providing alcohol to Mess, knowing she was underage, and the alcohol being a substantial factor in the injury to Ashley Johnson—could this claim rise to the level of willful and malicious injury?

Whether the intent or knowledge element can ever be attached to a negligence claim to make it rise to the level of willful and malicious injury, the plaintiffs failed to prove intent or knowledge here. The plaintiffs failed to show that the debtor either desired to inflict the injuries that Ashley Johnson suffered in the car crash or that he knew her injuries were highly likely to occur. When the debtor ended his party around 2:00 a.m. that morning, the scenario that ultimately played out was only one of many possibilities. Mess could have changed her mind about accepting a ride from Porzky or Hutchins. Ashley Johnson could have asked to get a ride home with one of them instead of with Mess. Mess and Ashley could have stood around talking or waiting in the car for Mess to sober up. Mess could even have driven safely while intoxicated, or Ashley Johnson may not have been injured if she had worn her seat belt. When the debtor

13

ended his party that morning, the car accident was a possibility, but at that point in time, it was not an outcome that was "highly likely to occur."

*Rule 11 Sanctions*

On October 3, 2012, the debtor brought a motion for sanctions under Federal Rule of Bankruptcy Procedure 9011 against plaintiffs and plaintiffs' counsel. Fed. R. Bankr. P. 9011. The debtor argued that plaintiffs presented a pleading and later advocated allegations and factual contentions in that pleading for which there could never be evidentiary support. A final hearing was held on the motion for sanctions on December 12, 2012, and the matter was taken under advisement.

At the time of the hearing, the debtor objected to plaintiffs' Exhibits 2, 5, and 6. I have determined that the exhibits in question are relevant and no other evidentiary objections are applicable. Therefore, the exhibits in question are received into evidence.

Federal Rule of Bankruptcy Procedure 9011 authorizes a bankruptcy court to impose sanctions on attorneys or unrepresented parties. Rule 9011 provides:

> By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . .
>
> > (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . .

Fed. R. Bankr. P. 9011(b). Rule 9011 is the "bankruptcy counterpart of Federal Rule of Civil Procedure 11." Collier on Bankruptcy § 9011.02. "Because Rule 9011 conforms to Civil Rule 9011, precedents that have been and will be developed under the latter will be of significant assistance in interpreting the former." *Id.*

14

The Seventh Circuit Court of Appeals has identified several factors that are relevant in determining whether a reasonable inquiry was conducted under Rule 11 and therefore under Rule 9011:

> To measure the reasonableness of a party's inquiry into the factual bases of its claims, we look to a number of factors including: "whether the signer of the documents had sufficient time for investigation; the extent to which the attorney had to rely on his or her client for the factual foundation underlying the pleading, motion or other paper; whether the case was accepted from another attorney; the complexity of the facts and the attorney's ability to do a sufficient pre-filing investigation; and whether discovery would have been beneficial to the development of the underlying facts." *Brown v. Federation of State Medical Bds. of the United States*, 830 F.2d 1429, 1435 (7th Cir. 1987).

*Divane v. Krull Elec. Co., Inc.*, 200 F.3d 1020, 1028 (7th Cir. 1999). The reasonable inquiry standard is "said to be objective." *In re Slaughter*, 191 B.R. 135, 140 (Bankr. W.D. Wis. 1995) (citing *Mars Steel Corp. v. Continental Bank, N.A.,* 880 F.2d 928, 932 (7th Cir. 1989) (en banc)). The reasonableness of an attorney's inquiry "focuses on inputs rather than outputs, conduct rather than result." *Slaughter*, 191 B.R. at 140 (quoting *Mars Steel*, 880 F.2d at 932). The right question to ask in this inquiry is "not whether the claim itself was frivolous or nonfrivolous, but whether the attorney conducted an adequate inquiry into the facts and the law before he filed the claim." *Slaughter*, 191 B.R. at 140 (internal quotation omitted).

A majority of courts have held that the burden of proof is on the moving party to prove that sanctions are warranted. *See, e.g., In re Weaver*, 307 B.R. 834, 841 (Bankr. S.D. Miss. 2002); *In re Kliegl Bros. Universal Elec. Stage Lighting Co., Inc.*, 238 B.R. 531, 541 (Bankr. E.D.N.Y. 1999); *In re Standfield,* 152 B.R. 528, 534 (Bankr. N.D. Ill. 1993); *In re Cedar Falls Hotel Props. Ltd. P'ship,* 102 B.R. 1009, 1014 (Bankr. N.D. Iowa 1989). Once a prima facie case has been established, "the burden shifts to the party from whom the sanction is sought" to show that the rule has been complied with. *In re KPMA P'ship, Ltd.*, No. 04-35261, 2006 WL 2868978

Case 3-12-00105-rdm    Doc 119    Filed 02/06/13    Entered 02/06/13 11:08:14    Desc
Main Document    Page 16 of 18

at *1 (Bankr. S.D. Tex. Oct. 5, 2006) (citing *Kliegl Bros.,* 238 B.R. at 541 (Bankr. E.D.N.Y. 1999); *In re King,* 83 B.R. 843, 847 (Bankr. M.D. Ga. 1988)).

Over the years, courts have dealt with the issue of whether there is a continuing duty to correct or withdraw an offending claim once the party becomes aware that there is no evidentiary support for the allegations. An early line of cases regarding the 1983 version of FRCP 11 "suggested that a paper could 'become frivolous.'" Georgene M. Vairo, Rule 11 Sanctions § 5.04 (American Bar Association 2004). This reasoning was incorporated into the 1993 version of Federal Rule of Civil Procedure 11: an attorney may be sanctioned for presenting a position to the court by "signing, filing, submitting, or *later advocating*." Fed. R. Civ. Pro. 11; *see also*, Fed. R. Bankr. P. 9011. There is no affirmative continuing duty to withdraw papers, although withdrawal "will generally immunize the target from sanctions." Georgene M. Vairo, Rule 11 Sanctions § 5.04 (American Bar Association 2004) (citing Advisory Committee Note); *see also*, *In re Southern Textile Knitters*, 65 Fed. Appx. 426 (4th Cir. 2003); *Pantry Queen Foods, Inc. v. Lifschultz Fast Freight, Inc.*, 809 F.2d 451 (7th Cir. 1987). An attorney has a safe harbor of 21 days after the motion for sanctions has been served to correct or withdraw the challenged position before the motion for sanctions may be filed with the court. Fed. R. Bankr. P. 9011(c)(1)(A).

In his motion for sanctions, the debtor alleged that that plaintiffs and plaintiffs' counsel knew that the third cause of action in the plaintiffs' complaint could have no evidentiary basis. The third cause of action sought denial of the debtor's discharge under Section 727(a)(4) of the Bankruptcy Code for making a false oath in connection with his bankruptcy case. 11 U.S.C. § 727(a)(4). Plaintiffs alleged that the debtor failed to disclose his beneficial interest in the Andrew J. Haydock Weihert Trust, created by the will of his deceased grandmother Ethel

16

Weihert (not to be confused with the debtor's interest in the Ethel D. Weihert Irrevocable Trust, also created by Ethel Weihert's will, which was properly disclosed in the debtor's schedules).

The debtor argued that the plaintiffs should have known there was no evidentiary basis to support their claim as of August 28, 2012, when the Joint Pre-trial Statement was filed and the plaintiffs "later advocated" their position in the third claim. At that point in time, the plaintiffs knew that the Wisconsin Circuit Court Access record in the matter of Ethel D. Weihert does not show that a testamentary trust was created. Additionally, when the motion for sanctions was served on the plaintiffs and plaintiffs' counsel on July 19, 2012, the correspondence included a letter from attorney Jay Smith of Neuberger, Wakeman, Lorenz, Griggs & Sweet of Lake Mills, Wisconsin, who handled the affairs of Ethel Weihert after her death. (Debtor's Ex. 3). The letter explained that the testamentary trust was never created because there were no assets to administer under the trust. *Id.*

However, even as of August 28, 2012, the plaintiffs and plaintiffs' counsel had good reasons for believing that there could be evidentiary support for their third cause of action. First, the debtor's Exhibit 8, which is an email from attorney Nordholm to attorneys Reyes and Owens on July 24, shows that the plaintiffs' attorneys had legitimate questions about Ethel Weihert's assets even after the July 19 correspondence. (Debtor's Ex. 8). The debtor attempted to answer the plaintiffs' attorneys' concerns regarding livestock, equipment, and machinery that remained with Michael Weihert instead of going into the estate, but the plaintiffs' attorneys properly sought to discover why these assets did not go into the estate. Second, the debtor had a proven incident of not disclosing an asset that was distributed to him under the will. The debtor did not include the vehicle that he received from the estate of Ethel Weihert on his schedules until he was challenged on his interests in the estate and the testamentary trust. The debtor's schedules

17

reflect that they were amended on June 6, 2012, to include the motor vehicle. This provides a reasonable basis for the plaintiffs' attorneys to believe that other distributions were not disclosed. Third, plaintiffs' Exhibit 6 is a letter from attorney Jay Smith to the debtor dated December 5, 2011. It regards distributions from the irrevocable trust: "Badger Bank is withholding your portion of the trust due to concerns that your share of the trust might be subject to seizure by creditors if a judgment is entered against you in case number 10-CV-1026 in the Jefferson County Circuit Court." (Pls.' Ex. 6). Since the irrevocable trust was withholding distribution, it is reasonable for the plaintiffs and plaintiffs' counsel to seek to discover whether there were other assets that were not being distributed.

Thus, on July 19, when attorneys Reyes and Owens received correspondence from the debtor's attorney attempting to show that the debtor had no interest in either the estate or the testamentary trust, plaintiffs and plaintiffs' counsel had legitimate bases for believing that the debtor could be concealing assets. The discovery period was set to extend for 120 days following the pretrial conference, which was held on July 24, 2012. The plaintiffs' attorneys had until near the end of November to develop the facts relating to their third cause of action. Even on August 28, when the plaintiffs "later advocated" the third cause of action by reiterating it in the joint pre-trial statement, it is likely that they still needed time to investigate the facts. The debtor provided no evidence that the plaintiffs had any additional knowledge at that point. Therefore, it was appropriate for the plaintiffs to seek discovery on the third cause of action, and sanctions are not appropriate in this case.

An order dismissing the complaint and denying requested sanctions will be entered.